I thank you very much. We're ready to proceed with our fifth and final case this morning, this afternoon, I should say. United States v. Vicaulic Company. Mr. Tyco. Yes, good afternoon. May it please the court, Jonathan Tyco for the appellant. I'll be arguing for 10 minutes. I'd like to reserve one minute for rebuttal. Yes, sir. Both the original and of many years produced pipe fittings in its own overseas factories without marking those fittings with country of origin. Then brought those fittings into the United States and imported the unmarked fittings without disclosing the lack of markings to customs. Could you tell me early on how you could tell that these pipe fittings were indeed pipes or pipe fittings of Victaulic? Well, they have a trademark that is sort of die cast into them, your honor. So if you're actually pipe fittings that you're talking about are the ones that you saw and and in some instances purchased on eBay? Our clients did, correct your honor. So you examine each one of those pipes or pipe fittings and you determine they are from the defendant in this case? Well, so our client identified examples of pipe fittings that were for sale by resellers on eBay that were selling them as Victaulic pipe fittings. So that was the initial test. Was the seller claiming that they were Victaulic pipe fittings? Resellers, of course, means that it was not Victaulic who were selling them, but somebody managed to get possession of them. Correct your honor. And that's not like Victaulic's normal, I mean that's not how they sell their product, right? They sell their product either directly to end users or through distributors. But the reason why our client... But you're certain or you plead that they are from Victaulic. I mean, stuff on eBay can come from anywhere. It could come from Europe, South America. How are you able to directly link them to the defendant in this case? Because they were being sold as Victaulic pipe fittings in about 80% of the cases. But not by them. Not by them. But again, the pipe fittings have the Victaulic trademark stamped on them. So in many of the pictures, the images that our client was looking at, they were identified as Victaulic pipe fittings. And then to sort of test their viewing of those photographs, if you will, they actually purchased a sample of physical specimens off of eBay. But in terms of your client's study, are you telling us that it wasn't simply... It wasn't even verified by seeing the Victaulic mark in photos, but that in some or many of the cases that you accepted the representation of the reseller on the photograph? Maybe I should take a step back and explain what the purpose of the study was. So our clients had seen evidence in the market that Victaulic was importing unmarked pipe fittings. But because they are not insiders at Victaulic, they were trying to develop some convincing evidence that they could present that in fact this was occurring. They chose eBay because eBay is a secondary market. And if you think of what eBay is, it's like a big blender. These pipe fittings are coming from all over the country. They've been purchased over various points in time. They're coming from multiple sellers. And so you get sort of a very randomized sample of pipe fittings. How do you know the duties were not paid for those pipes? Because if the pipes were unmarked and coming in from a foreign country, it would be impossible to bring them in and sell them. Unmarked you mean as a country of origin? Right. The markings that we're talking about, Your Honor, are country of origin markings. So when I say unmarked, I'm using the term unmarked, but what I really mean is marked not in compliance with the Tariff Act. Even taking Foglia's somewhat reduced burden under 9b, we still need to allege particular details of a scheme to submit false claims or avoid obligations paired with reliable indicia that lead to a strong inference that claims were actually submitted or obligations actually avoided. The crux of this, I mean the link that there is a problem here, seems to be the eBay study. And where are there sufficient indicia of reliability that is even representative of the market to satisfy the standard? I think that is conflating two separate issues. The 9b issue, the Rule 9b issue, is simply an indicia of fraud standard that was applied in Foglia, was intended as a substitute for allegations of specific false claims. And so this is a common issue in False Claims Act cases, where you have a relater who doesn't know the specifics of the claims that are submitted to the government, but they know that there is evidence generally that the company is doing something wrong, and that wrongdoing would naturally lead to the submission of false claims. So in Foglia it was Medicare, Medicaid type claims. And so in instances where a complaint actually alleges specific false claims, on such and such a date, the hospital submitted a claim to Medicare for payment, and that claim was fraudulent. That satisfies 9b. The problem in Foglia was that the plaintiff wasn't able to allege the specifics of the claims. They didn't know when and where the claims were submitted. So far it seems in all fours with your client. No, because our complaint, both the original complaint and the amended complaint, alleged the specific instances that we claim as fraud. We have over a thousand specific instances identified in our complaint. But do you know in any of those shipments what the markings on the pipes were? We allege that they were not marked. But do you know? I mean, has anyone looked at them yet? Do you have any specific example of a pipe from Poland or China or another foreign ectolic source that was not marked with the country of origin? Well, two points to that. First, we're here on a 12p6 motion. So when you say, do you know, the question here is, what have we alleged? It's not what can we prove. And that is a significant point here, because I think what happened in the district court is that we ended up litigating sort of the merits of this underlying statistical study that our client did to try to support the factual allegation of the complaint. The factual allegation of the without marking them with country of origin, imported them without disclosing that marking to the government, and never paid marking duties. Those are the key factual allegations. And if you accept those factual allegations as true, as we say you should under 12p6, then really the legal question is simply, have we stated a claim under the False Claims Act, the issue that the Department of Justice has submitted a brief on? But what happened in the district court, and I think why this case appears so complicated, is that the district court looked past the allegations of the complaint to try to determine whether or not we had sufficient evidence to support them. And she required this sort of evidence. That bothers me a lot, too. That's not really looking for evidence in post-discovery. That's just saying we need to have something more than a conclusory assertion that there was a false claim here. A plausibility requirement. Right. And I believe that's the 8a question, the Iqbal Twombly question of plausibility. And my point is simply that that's not a 9b question. 9b is solely about notice. This court has said multiple times that 9b is about notice, not about testing the facts of the case. And our complaint does put Victaulic on notice of exactly what we're claiming. I mean, there's no, they're not in doubt about what the nature of our claim is. It seems to me what we were addressing in Foglia in looking to those other courts that taken the more nuanced approach, it really is about what level of specificity is required for 9b pleading for a false claims act. It's about what specificity is required to meet the particularity standard of 9b. It's different than the plausibility standard of Iqbal and Twombly. So again, 9b is about notice to the defendant. And the problem that those cases are wrestling with is that if the relator is not able to identify the specific claims, is the defendant on enough notice of what they're being alleged to have done? And what Foglia said is that, look, in cases where the plaintiff is not able to identify specific instances of fraud because they don't know when the claims were submitted, that it is a sufficient substitute for that identification of specific claims to allege a that reasonably would have led to the submission of false claims. That's really not the problem that I think is concerning you or that concerned the district court. There isn't any question here that we've identified the specific instances that we claim are fraudulent. We have a list of over 1,000 of them attached to the complaint. I'm sorry. What's attached reflects imports. And the complaint alleges explicitly that in connection with those imports, they import unmarked pipe fittings, failed to disclose that marking to the government, and failed to pay marking due. Nobody knows whether they were unmarked. Well, Victaulic knows, and we believe our study shows that. But that's not a 9b issue. That's all I'm saying. But you need some basis. 9b or not, you need to be alleging with specificity some reliable basis in the complaint to conclude that what you identify as these thousands of imports have any problem. Yeah. I hear what you're saying, Your Honor. I think of that as the plausibility problem, not as the 9b problem. But let me get to the guts of what you're saying, which is, well, why do we allege this? That's really what you're asking. So let me step back and say, what is the genesis of this case? So our clients are people who are experts in international trade and customs law who operate professionally in the pipe and tube industry. And they were aware of certain facts based on their own personal observation that led them to believe that Victaulic was importing unmarked pipe fittings. And those facts were that Victaulic had, over the course of about a decade, essentially shut down its U.S. production facilities, down to a very, very bare minimum, and at the same time had opened up huge factories in China, Poland, and Mexico. Then what they were seeing in the market by actually looking at Victaulic pipe fittings was that there was suddenly a large number of Victaulic pipe fittings that have no country of origin identified on them. And the evidence of that, there is a large number in the marketplace that are produced by Victaulic that have no markings on them. What is the, where is there any specificity in the allegations as to that, that those without any markings were, in fact, imported from abroad? Well, they conduct, in order to sort of confirm what they had personally observed, they then devised this study where they tried to find sort of a, develop a valid statistical model, if you will, that would take a sample of the Victaulic pipe fittings in the market and try to determine whether they could find pipe fittings that had a foreign country of origin. So aren't we back to, even as a common sense matter, whether that study, which is really where you're pointing to say there's something wrong with these thousands of examples attached to the complaint, that that is even a representative market? Right. And we're looking at such a very small number, such a fraction of what's been, you know, allegedly imported or out there in the marketplace. How can that rise to the standard that we articulated in FOBIA? And that was exactly the district court's concern. And that's exactly why, in connection with the amended complaint, we actually retained a statistical expert, Dr. Weiner from the Wharton School, who looked at the study that our clients did and offered a declaration. His opinion was based on the pipe fittings that you saw on eBay? Correct. So Dr. Weiner looked at exactly the data that our clients had collected and analyzed and reached the conclusion. And how many samples did he look at? Well, our clients looked at 221 samples. And they found... Out of those, how many did you find that came from Victaulic that did not have country of origin marking? There was one out of 221 that had a valid foreign country of origin marking. And that one was a very unique sort of large pipe fitting that was a lot different than the other ones they looked at. And this is really the point. Now, you say from that, that the thousands that you have listed on, that you have on the list attached to the complaint were imported without country markings by Vitaulic without paying a duty? Correct, Your Honor. And let me try to explain why I think that conclusion actually is valid. And if this is the court's main concern, I would really urge you to read Dr. Weiner's declaration because it really explains this as a matter of statistics. But here's how I think about it. I think you can assume we have. Doesn't he also accept the assumption that this is a representative marketplace? And that assumption is critical to the conclusion that you are trying to draw and create that... Sure. Sure. I think he does make the assumption that it is a representative marketplace. But he then also goes on in his declaration to say, look, the critiques of that study that were presented by Vitaulic and by the district court don't undermine that assumption from his perspective. And I think the reason for that is it is because of the nature of what eBay is. Because it is a secondary market, it is like this big mixing bowl that if you pull out samples from eBay the way our client did, that is going to be a representative sample. Because these samples are coming from all over the country. They're coming from multiple sellers who we know bought them at multiple different points in time. Might they come from outside the country? I believe all of the sellers were domestic. Yes. But the sellers are domestic, but the pipe fittings themselves. Well, these were pipe fittings that were located in the United States. So they had come into the United States. They were either manufactured here or imported. How do you know that? Because the pipe fittings were being sold by sellers in the United States. Well, yeah, but the sellers could have obtained them outside the country. Well, and brought them in in a suitcase? I mean, I suppose that is theoretically possible. That is theoretically possible. And all of these 221 samples, you didn't actually buy them and hold them in your hand. Some of them you looked at photographs. And some of the photographs you couldn't tell if they were stamped with country of origin or not. Correct. That's right. So let me explain why I think that that's not a problem. Do finish up, though, because I have to get to the next. And this is really the key point. If I look at one photograph on eBay and I don't see a country of origin marking, I can't really draw much conclusion from that. If I look at two, I can't draw that much conclusion. If I look at 10 and I haven't yet seen a China or a Poland or a Mexico mark, I start to get suspicious. If I look at 50 and I haven't seen China, Poland, or Mexico on any of them, I start to become more suspicious. If I look at 100 and I don't see China, Poland, or Mexico on any of them, now I start to think there's a problem. I then go and buy 10 samples. I don't see China, Poland, or Mexico on any of them. That is the nature of statistical analysis, that the more data points you have, the smaller the margin of error. Were some cases based on 10 samples that you physically have and saw? No, absolutely not, Your Honor. Absolutely not. You basically only saw 10. You bought 10 samples. Correct. Those are the only ones that you physically have and that you inspected. That were part of that study. I believe our clients looked at other ones before they did the study. What do you mean on eBay? No, that they had seen physical samples of pipe fittings that did not have a country of origin marked on them. I'm very skeptical of statistics. I don't know. It goes back to my daughter studies statistics. She said, Mom, you can prove anything you want to prove. Maybe, well, I should let you know, I've got that thought in the back of my mind. If you were a juror, I would say that's great. You're allowed to bring that skepticism into the jury room. But here, we're on a 12 v 6 motion where we have alleged in great specificity in the complaint exactly what we claim Victaulic is doing and why they're doing it. The question of whether we can prove it or not is not a 12 v 6 question. Say we are willing to accept that you have in your proposed amended complaint, but you have another big hurdle to get over in the district court's exercise of discretion in dismissal with prejudice. And then you're seeking after the fact to amend the judgment and get this amended complaint filed. How do you get around the exercise of discretion given that you waited eight months when the judge had already broadcast her concerns, you had had a hearing, there had been a motion to amend, I'm sorry, a motion to dismiss on the record, and this is close to a year going by without you taking any action? Well, it's close to a year going by, but in the history of the litigation, all that had happened is we had filed a complaint, they had filed a motion to dismiss, and the court had granted it. I mean, in the normal course of litigation, that is what happens before you file an amended complaint. You wait to see what the district court thinks of your complaint. But Shannon, she had already signaled that you have some problem with your complaint. Well, the signaling was extremely vague. This is a judge on the bench saying, well, I think your complaint maybe isn't enough, but I'm taking it under advisement. And in the context of that same hearing, I stood up, I was there and said, Your Honor, if that's the issue, if you think we haven't alleged enough facts, we would like to file an amended complaint. But we've said in Jang that that is not enough. If you want to go ahead and file, you can go and do that. If you opt not to because as there, you want to test the pleadings and let things run their course, you take on some risk in doing that because it is a matter of discretion for the district court. Well, honestly, Your Honor, I don't think we were, we did not think we were taking on that risk at that point, because this court has certainly, and I'm not aware of any federal circuit court that has ever held that it is undue delay where the first time you seek to file an amended complaint is at the pleading stage where there's been no discovery, no trial date, the defendant hasn't even filed an answer. That's what the prejudice is about. Where is the prejudice? The problem is waiting eight months. It's sort of like, let's wait and see what the court says before we take any other action. Your Honor, I admit that's exactly what we were doing. That's exactly what we were doing. We were waiting to see what the court said because we thought the court was going to deny the motion. You say that based on the comments that the judge made on the record, that you were not alerted to the fact that you have serious problems with your initial filing? Your Honor, judges on the bench in the district court often express skepticism about this, that, or the other thing at a hearing on a motion to dismiss. You don't know what the judge actually thinks and what the judge is actually going to rule until that ruling comes. What happened at the end of the hearing was me saying, Your Honor, if there is a concern about the factual allegations, we would like to file an amended complaint. And the judge essentially saying, I'll take it under advisement. Then we didn't hear for six months while she worked on her opinion. But that was the status at that point in time. Isn't the case under the federal rules that in doing that, which is certainly a valid, although strategic choice to make, that what you are abdicating is the presumption of liberality that would otherwise go along with 15A. Once you're in the Rule 59 world, we have some presumptions about finality that goes along with the judgment having been entered. I would say that that's normally true, but this court has also said that when a complaint is dismissed for failure to plead sufficient facts, that that dismissal should be without prejudice and with leave to amend. So in this case, the district court judge entered a judgment, but that entry of that judgment was itself improper. And that's why this court has also said when the Rule 59 motion comes in that context, that you essentially just treat it as a 15A motion. Okay, Mr. Tico, you have five minutes, did you say?  One minute. I only got 10, so thank you, Your Honor. Mr. Whitaker? May it please the Court, Henry Whitaker for the United States. We participated in this case not to address the issues of pleading that you were discussing with Mr. Tico in the opening, but rather to address the question of law. And regardless of how the Court resolves those other issues, the Court should not affirm the district court's judgment on the ground that as a matter of law, a violation of the False Claims Act, Reverse False Claims Act provision is not pleading. Before we get to the merits, which I know you're eager to address, but if we were to affirm on one of the various pleading grounds here, what is it that you're suggesting we would do as to merits? Even if, say, we disagreed with the district court's merits, our ruling? I don't think the Court needs to address our issue. If you affirm on the ground that they haven't pleaded adequately under Iqbal, or haven't pleaded in front of the particularity, or if the district court did not correctly deny them leave to amend, I don't think you need to reach our issue. Our concern is... Wouldn't it be helpful if we did? Well, Your Honor, I think... How do you think we agree with you? I want favorable decisions, yes. That's great. But, I mean, normally the Court wouldn't reach it. But, I mean, I think that... Well, this is, I think it's fair to say, is a difficult and unsettled issue. And so perhaps it would be best for the Court not to address it. And I think... We don't shy away from that. Yeah. Your reluctance seems a little surprising. Well, well, I mean, I'm not going to shy away from getting a favorable decision, of course. And one thing that is notable, I mean, the ground that the district court did rely on to say that there was no False Claims Act claim here is a matter of law. I mean, as I understand it, the court is not even defending that on appeal. I mean, what the district court said was, if you have, under the reverse False Claims Act provision, which Congress specifically broadened in 2009, if you have some of the acts of avoidance, if they are necessary to create the obligation, then that somehow cannot give rise to improper avoidance of an obligation, even if one assumes that this is precisely the kind of obligation that Congress intended to cover in the reverse False Claims Act provision. And that is just not a tenable reading of the amendment, which specifically eliminated any requirement that there be some separate act of false statement. Well, help us walk through that. Because to get there, I think you're relying in large part on legislative history. If we're looking at the statutory language, contingent was in there. Contingent was in there to make sure it was covering customs duties. The Kilem amendment ended up taking contingent out. And so we're left with, it's still got to be established. Maybe it doesn't have to be fixed, but it's got to be established. And aren't we right back to the problem of when are these duties established? Can you have an avoidance or concealment that is the very same act that's giving rise to a liability? Well, first of all, two separate points. First of all, the district court's reasoning about whether there needs to be a separate act assumes that there was a valid obligation in the meaning of the false claim. In other words, even if, let's say, the Kilem had, I mean, even if Congress intended customs duties to be covered, the district court's reasoning would prevent us from going after, from any mismarking duties ever being an obligation, because some of the acts of avoidance were necessary. And that can't be right, because one of the things Congress did cover expressly in the text of the provision is, for example, retention of an overpayment. I mean, when you retain an overpayment improperly, so part of what gives rise to the obligation to repay is the fact that you held on to the money. And yet, that is expressly part of what Congress covered. Now, your second point about the legislative history, we also have this argument that, look, quite apart from this separate act requirement, which is wrong and which the public itself does not even defend, what are the obligations that are covered? And we do certainly do have something in the very text of the statute on that. We have the fact that Congress expressly defined obligations to include obligations that are unfixed, whether fixed or unfixed. And that language is taken directly from the Tenth Circuit's decision in Barani, which held that even though an obligation may be, in some sense, dependent on the exercise of some government discretion, and there's no question the new statute reaches some of those, like contracts, like contracts is a great example. And there's an Eleventh Circuit's decision that said that breaches of contracts, contractual obligations, were obligations. So that is in the text of the statute. But beyond that, Your Honor, you're quite right. I think in the legislative history, Congress made very clear, and this is cited at JA 658, I think, that it was specifically approving of a reasoning of Al Barani. But ultimately, I don't think the Court needs to get into what kind of obligations, what would happen if it were a contingent obligation, because the obligation here is not contingent. If the facts alleged in the proposed First Amendment complaint are true, they absolutely owed those marking duties. There was nothing contingent about their obligation to pay that. So this falls within the heartland. Help us with that in the text of the statute, because we need this to see this as an established obligation. And we're dealing with 1304I, which connects these two parts for the levying of the duty here. Right? And we've got, if at the time of importation the article is not marked, and such article is not exported or destroyed, as specified prior to the liquidation, then there shall be levied, collected, and paid. With levied, isn't that the moment when the obligation is established? No, no. I think that the obligation is established when the obligation accrues, as is the case. And the statute on its face clearly says that the obligation accrues at the time of importation. But regardless, even if you accept that reading, which we don't agree with, even if you accept that reading, I mean, what's alleged here is not just a failure to mark at the time of importation. What is alleged here is that Victaulic introduced into the stream of commerce unmarked goods. So at some point they had to be paid, whether on the front end or what they were, at some point the obligation accrued, whether on the front end or whether on the back end. And so if it was on the back end, as I think Your Honor's question suggests, it still was a fix, it was a debt. They owed those marking duties. If the allegations are true, maybe there are pleading problems and other problems with the way they pled that. We haven't weighed in on that. But if the allegations are true, they absolutely owed those marking duties. There was nothing contingent about that obligation. Where is the avoidance or concealment? When Congress uses words like that, we're looking for some element of evasion, right? Not simply nonfeasance. How can the mere failure to make a payment give rise to a concealment or avoidance in the absence of an already existing duty to do something? Probably a poor choice of words, but an affirmative obligation to disclose or to act. Well, first of all, we do have concealment alleged here. I'll address both of those things. Let's talk about concealment. They certainly did conceal the fact, if the allegations are believed to be true, of the fact that they were importing unmarked goods. And under 19 U.S.C. 1484, they have an obligation to tell us if they are bringing in unmarked goods into the United States. And if they didn't do that, I think absolutely they did conceal the fact that their goods were unmarked. And by not involving customs in that process, they did avoid their obligation. Because what normally happens, if unmarked goods come in and we find out about them, what happens is they get marked under our supervision. And if they aren't, they have to pay the duty. That process didn't happen. Now, is that all done at ports of entry? Well, not necessarily. There are some instances where they can be marked after they're released to the importer. And there's a whole set of detailed regulations governing this, which— It's not very easy for those things to get through the country without there being some accountability. Well, the truth is, is that, I mean, it is largely a self-regulating process. And if they don't report it, it's really hard to pick it up. Right. If they don't report it, it is very hard. And this is exactly one of the reasons why I think it would be problematic to say this is not the kind of obligation that the False Claims Act is directed towards. Because it is precisely in these areas where enforcement is difficult that it is useful to have False Claims Act liability. I mean, and just to go back to another area that's very common, I mean, it's common, apparently, for us to pay Medicare, overpay Medicare providers. We can't have a situation where if somebody improperly avoids their obligation to repay, let's say, that would be a big problem. Because that happens all the time. And that is a huge, that's huge dollars for the United States. And we need additional tools to go after those kinds of fraud. And precisely these kinds of situations where there's asymmetric information, where they have concealed from us the fact that these goods are unmarked. But we also don't want to countenance a situation where a veteran who doesn't pay their VA bill on time has committed a False Claims Act simply by a failure to pay. So we need an affirmative obligation. I'd like to go back. You pointed to 1484, which also makes an appearance in the complaint. But 1484 has a number of parts. Where is the affirmative obligation that you're suggesting here was avoided? Well, we're not suggesting that the 1484 created the obligation. I think 1484 created the duty to disclose, which would be part of the basis for the acts of concealment. But just to back up to your concern about, I don't think it's fair to say necessarily that mere nonpayment would in and of itself be enough. Because remember, the statute talks about not avoidance in the abstract, but improper avoidance. Knowing an improper avoidance. That language is doing some work. And would not necessarily reach mere nonpayment without more. Now, that said, there are certainly going to be many instances in which alleged nonpayment forms a significant portion of the, along with other requirements, and there are other requirements like Sienta and so forth. There are going to be many instances where nonpayment is going to form a significant element of the alleged fraudulent conduct. And that's the real problem with this. We do have to hear from Mr. Hill. Sure. If there are no further questions, I'm happy to sit down. Thank you, Mr. Whitaker. Thank you. Good afternoon, Your Honors. Thank you. May it please the Court, Thomas Hill on behalf of Victaulic. I almost don't know where to begin. But Mr. Whitaker is correct insofar as we don't think you have to reach that third question with respect to the legal, the pure legal question, because you certainly can affirm on the basis of Judge McLaughlin's proper exercise of her discretion, both with respect to the futility of the amended complaint and also with respect to the undue, the equitable issue with respect to undue delay. Do you defend the decision below on merits grounds? Yes, we do. I was just about to come to that. But we do defend it. And I think I'm not so sure Mr. Whitaker indicated that we do. Let me address that. It seems to me that the Court wishes me to address that. This is a contingent obligation. And I think if all you have to really do is look at the language of 1304, look at the language of the statute as Judge Crouse, you were beginning to do earlier. I think there is specific language of contingency, if you will, within that statute in two respects. First of all, marking duties only come into play if the three other remedies that are provided for are not accomplished. In other words, marking duties only become an issue if you can't re-export, you can't mark, or you can't destroy. So it is contingent on that sense. And when Mr. Tickle alleges in his complaint that the marking duties accrued and became due upon importation, if you think about it, and also alleges that Victaulic or any importer for that matter was under obligation to disclose to customs that it owed marking duties at the point of importation, if you think about it, that disclosure would result in no obligation to pay to the United States because customs would be required to exercise one of the three other preferred options of re-export, destruction, or marking under their supervision. Well, why don't I take the view that the government has that what we're talking about is a duty that is established at the outset, like many other customs duties, and then you can sort of defuse it or extinguish it if you undertake one of these other acts that appear in the second part of the statute? Because I don't believe that the duty ever arose, and the second part of the statute that I would call your attention to, and I think Judge Krause, you've already sort of  I think the word levied in the statute suggests that before the obligation to pay to the United States ever arises, customs has to take some affirmative step. It has to levy this duty, and I would contrast this to a tariff, for example. Tariffs, when a good comes into the United States, the duty to pay the tariff arises at point of entry, without any act necessary by customs. By operation of law, the tariff is imposed. The marking duty, on the other hand, that obligation to pay a marking duty does not arise at that point, and it doesn't arise until customs actually affirmatively does something, and I would point the court, I found a case in the Court of International I would suggest lays that out. So I think this is very clearly one of those contingent obligations. Doesn't that put too much on the shoulders of the government? Granted, there's a lot of conveyor, but as I understand your argument, it means that this 10% duty we're talking about is never established unless customs happens to detect the importer's attempt to bring unmarked goods in and avoid payment. I think that's correct, Your Honor. I think that's the language. Now, customs is not complete. If the False Claims Act doesn't apply, and we're trying to squeeze this into a False Claims Act construct, if the False Claims Act doesn't apply, it doesn't mean that customs is without remedy. Customs has very elaborate enforcement mechanisms and a statute that gives it the power to assess penalties far greater than would be available under the False Claims Act. But when Congress was going to pains to make amendments to the statute in 2009, for in part the purpose of reversing the Sixth Circuit's decision encompassing customs duties, why should we read what they then put in place as a false claim? Meaning that there was in fact no established duty unless it was detected by customs. That's exactly what they wanted to avoid. Well, I think what, first of all, I think what Congress was trying to do at the time, the case that you make reference to was the kind of a case that is the one where this issue typically arises. It was a transshipment case. In other words, that occurs when the goods are, let's hypothetically, manufactured in China, sent to Malaysia, and then imported from Malaysia and indicated on all the entry forms that they were products of Malaysia in order to either pay a lower tariff or for anti-dumping purposes or whatever. But that's the scheme, if you will. And that's exactly what was being discussed in that case. And in the case that you just referenced, Judge Krauss, the Sixth Circuit had invalidated both kinds of duties under the False Claims Act or invalidated a cause of action for both kinds of duties under the False Claims Act. I think what Congress really was intending to do, frankly, was with respect to the tariff based, if you will, False Claims Act, where the duty clearly arises upon importation as opposed to the marking duty. And I would note here, by the way, ironically, just as a factual matter, that this case could never have arisen here. Mr. Ticko could never have undertaken the flawed investigation he did if it weren't for the fact that Vitalik honestly and truthfully indicated on all of its import forms the correct country of origin, namely China. So that's very different than the circumstance in the Sixth Circuit case that prompted Congress to take the action that Congress did. Why don't we have enough when you combine the 10% custom statute, 1304I, with 1484? Why don't we have enough to say, here's the statutory scheme. There's this, for someone who imports goods with the intention to put them into commerce, that they have a duty that's set by an obligation by 1484 to do one of various things. But either they're going to be marked or there's going to be some additional disclosure that is additional duty should be assessed or that the goods need to be overseen for destruction or export. It isn't a statute that talks about completing the entry by providing such information as necessary to major customs to determine whether any other applicable requirement of law is met. As one alternative to assessing the duties, isn't that pretty squarely telling the importer, you've got to do one of these things. And if you don't do that, because what you're trying to do is avoid the 10% customs duty, then under the False Claims Act, you have avoided or concealed. In that hypothetical, what you're doing is not trying to avoid payment of the 10% marking duties. What you're trying to do, because if you actually disclosed in that circumstance, you would never get to the obligation to pay monies to the United States because customs would require one of the alternative remedies. So the obligation to pay, which is what the False Claims Act is predicated upon, never would arise. So the marking duty only arises once the goods get through customs and are out in the country? As a practical matter, yes, Your Honor. If they're not marked. The importer, for example, does not have the option of saying to customs, I'll just pay you 10%, let them go. We won't bother with marking them or re-exporting them or destroying them. That's not an option that's available to the importer. The 10% marking duty only comes into play if either of those three predicate options are not available. Let me ask in that area of plausibility, do the plaintiffs have to allege that there is a particular incident of a Victaulic pipe fitting that was manufactured outside of the country that has come into the country without being properly marked? Do they have to allege such a thing? I would suggest, Your Honor, that what they have to allege is they have to allege sufficient facts as opposed to conclusions that are reasonable and reliable that lead to a strong inference. I don't know necessarily that they have to allege that particular import. But in this case, everything they allege is completely conclusory. And the study, the so-called eBay study that the court was addressing earlier, is just fatally flawed. And it's fatally flawed for any number of reasons, but let me address two specifically. There are two assumptions that underlie that study. One, Judge Crouse has already talked about, which is really whether or not this is a representative sample of Victaulic products. And the answer to that is no. And there's no other than the conclusory allegation that it is. There's no basis in the complaint to be able to make any determination as to how that conclusion was reached. And their statistician did state that he was assuming that that was correct. But there's a second assumption before, I guess you can address either one of them first, which the statistician actually didn't even mention as an assumption, but it's just by logic we would all agree. And that is that photographs on eBay can serve as a reliable determinant factor to establish whether a particular piece of equipment is in fact marked. And the answer to that, I would suggest to the court, is unquestionably no. And I would suggest to the court in at least two regards that are in the record before you. Before Judge McLaughlin at the hearing, four photographs were presented to her and they're now incorporated in the joint appendix and they're also actually referenced in the proposed amended complaint as well. Four photographs of the same piece of equipment. In one of those photographs, the marking China appears. In three of the photographs, that marking doesn't appear. You can't see it. And it all is a function of the angle in which those photographs were taken. You can't possibly have a reliable study using one-dimensional photographs when the question of whether or not the marking is visible to CFI as they examine it is completely a function of what angle the photograph happened to have been taken, what the seller on eBay, whoever that may be, why he chose to use that photograph as opposed to any other photograph. And in that regard, it's interesting to note that CFI's sort of motive, alleged motive for the activity that's at hand here is that U.S. made products command a higher price than products that bear a China marking. Well, an eBay seller would be obviously motivated to conceal or to hide the China marking on their photograph. Pick the photograph that doesn't show it. So I'd suggest for that reason. And then secondly, let's talk about the 10 pieces of equipment that were in fact purchased. Because the study undoubtedly has its flaws. But by the time of the proposed amended complaint, in addition to the study, there's also a witness who would talk about a particular package that didn't have marking and had a packing slip indicating it was from abroad. And this corporate email for whatever weight that may have. But when we look back to what's required for pleading purposes, we need historic facts. But we have the allegations of 83 million pounds of pipe fittings coming in. Significant majority have not been marked. Why aren't those historic facts? Well, the first part of that I would accept as a fact, the 83 million. And the second part of it I wouldn't accept as a fact that the majority of those were not marked. We have no idea from the complaint whether they were or not. Because that's an inference that is drawn completely from their eBay study. So then we pull into play the eBay study and these other pieces of evidence. But when we're looking at whether that is enough, we've got the Supreme Court saying in Iqbal that these allegations are to be assumed as true, even if unrealistic or nonsensical or shenerical or extravagantly fanciful. Well, I think we've got a plausibility standard. We've got this court and FOGLIA suggesting. I think this court's opinion in FOGLIA is actually quite instructive. Let's talk about FOGLIA for a second. FOGLIA involved an insider, which obviously does not exist here. An insider who gave very detailed and specific information with respect to what this insider observed with respect to the use of this medicine and the fraudulent scheme, if you will. What the insider was missing was the ability to allege factually whether or not claims were submitted to the government. Because he didn't work in the billing department, he didn't have access to the billing department. This court said in what it characterized as a close case that the specificity and the reliability of the other information that he had provided, the details that he was able to provide, allowed this court to find that there was a, quote, strong inference with regard to the missing piece. I would suggest to the court that in this case, the missing piece, if you will, is whether or not these products were marked properly or not. The whole essence of the scheme is the missing part. And the standard that Judge McLaughlin applied and that this court should affirm is whether or not there is sufficient reliability provided by the eBay study to support a strong inference, which is a stronger language than in Ishbal, for example, where, and Ishbal, of course, didn't involve a fraud case. So 9B didn't come into play in Ishbal. It was simply under the strictures of 8A. Wasn't it also central to our thinking of Foglia that the documentation, the evidence, was in the hands of the company? And that's just as true here. The court, well, that's always going to be the case. And the court did obviously point to that in deciding to establish the, quote, unquote, more nuanced view. As the court understands, there's a split in the circuits with respect to this very question. And in many circuits, Foglia would have been out of luck completely. But the fact that the defendant always is going to have more information is not a reason to open the gates to- Well, let me ask you. Judge Krauss referred to the one instance where there was a witness who testified about a box of unmarked pipe that had a shipping document from Poland. Well, it was actually, Judge Roth, it was, first of all, it was certainly not testimony. I mean, it was about as far from testimony as you can be. It was an unnamed person, an unnamed source, who told another unnamed person that they had some recollection with respect to having seen a box that had a packing slip in the box that might have suggested that the particular product in question was, in fact, manufactured in Poland, even though it wasn't marked. It's about third-hand hearsay, unnamed source. No who, what, where, why. And I would suggest it, Judge McLaughlin, was certainly, it was certainly proper for her not to rely exclusively on that one piece of new information in the proposed amended complaint in order to, you know, in her exercise, again, of discretion. We've talked a little bit about the merits in 9b. What about the district court's discretion to dismiss with prejudice or not allow amendment of the judgment based on undue delay? Here, we're talking about only eight months. There had not been any prior amended complaint. And there's nothing that the district court found or that I see alleged as to prejudice. Can you point us to any other case with those circumstances where we have upheld as a proper exercise of discretion a district court's refusal to allow the filing of an amended complaint, a first amended complaint? Your Honor, I don't have a case for you specifically, and I'd be happy to provide it subsequently. I don't have a specific case, but I think I am aware that there is no case that I'm found an abusive discretion by a court in the undue delay circumstances similar to what's presented here. In this case, first of all, it's not a it is not completely accurate that this was the first effort at amending the complaint. I mean, as a technical pleading matter, maybe that's right. But what the plaintiff did here is they attached in response to the motion to dismiss, rather than amending the complaint, they attached a 20 page declaration by the president of CFI outlining essentially the investigation that CFI had done. Judge McLaughlin made it abundantly clear at the very beginning of the hearing that she was dismissing. The only issue for her was whether it was going to be with or without prejudice. It couldn't have been clearer. And she said in deciding whether to dismiss with or without prejudice, I will consider what I learned at this hearing, and I will consider the declaration. That effect sort of became the first amended complaint as a practical matter. There could have been no, I was at that hearing, and obviously the court has read the transcript, but there was no mistaking as to what was going to happen. And this court has not countenanced those sort of wait and see attitude. They knew exactly what was coming. They waited for eight months. Judge McLaughlin, frankly, I think, waited for a good part of that eight months for the amended complaint to come in that Mr. Tico had suggested that the complaint might be forthcoming. You agree you have not alleged or assured any type of prejudice here? Well, I would agree that Judge McLaughlin did not reach the prejudice issue. I would suggest to the court that it is not correct that we suffered prejudice. It's generalized prejudice. This is a very well-respected world leader company that is accused publicly of fraud. The allegations of fraud became unsealed two months after they were filed, and they've been unsealed and remained in the public domain now for a year and a half. That is prejudice to a company and certainly prejudice to Victaulic to impugn its integrity, to allow its competitors to use the dependency of this matter to impugn its integrity. Mr. Whittinger, we do have to finish up. Thank you very much. Well, thank you, Your Honor. Mr. Tico, you reserve one? Your Honor, could I just mention one mechanical thing? I'm sorry. It came to our attention as I was preparing, frankly, that the Joint Appendix 378 to 381, which are the four photographs, they were supplied electronically as part of the appendix, and they were in color. That's how they exist in the appendix, in the electronic version. They're in color. But when you try to print it in black and white, it doesn't come out very well. I brought with me some color photographs, and I asked the clerk's office what to do, and they said that I should just advise you of this fact. I'm happy to provide them in some fashion, but I just want the court to be aware. I don't know if the court looks at it in its electronic version or in its printed version, but the printed version might not be much help. Are they going to have any help to us? Well, I think they would be, Your Honor. All right. How many did you bring? I brought copies for each of you. Mr. Tico has those? Yeah, he has them. I brought a copy of what I have here for him as well. Okay. Would you give them to the clerk? Sure. Thank you. Your Honor, we have no objection to this. In fact, we have allegations in our complaint about these photographs. These are photographs that Mr. Hill brought to the motion to dismiss hearing and presented to the judge to try to prove that, in fact, they were marking their pipe fittings. What these photographs show is that there's a tiny little ink mark inside the pipe fitting that says China once. That is a noncompliant marking, even if this is a legitimate photograph. This is unauthenticated. They didn't submit it with any declaration or any testimony. Mr. Hill just handed it up to Judge McLaughlin and told her what he thought it was. But even if it is what they say it is, this is proof that they are not complying with the marking duty statute, and we allege that specifically in the amended complaint. So we're more than happy to have you look at those. On this question of prejudice... Are you going to hand them up to us or hand them to the clerk? I believe he's going to. On this question of prejudice, Judge Krause, you're correct. The tolerant never argued prejudice in the court below or here, and the only prejudice that the court found was prejudice to itself. And there is a requirement for finding a prejudice when the basis for denying the motion to leave to amend is undue delay because it's getting to the question of whether amendment is inequitable. And here, there really is no prejudice to the court, and the district court wasn't really able to articulate what it was. The only prejudice I could think of is that the court was required to rule on our motion for leave to amend. But that can't possibly be prejudice. That's what judges do. That's what they do. Let me go back to this question because it came up again about whether or not there's an assumption that eBay is a sort of representative of the market. Dr. Weiner addressed that question in paragraph 11 of his declaration. He did make an assumption, but he went on to explain why he made the assumption. It wasn't just an assumption that he pulled out of thin air. He says in his declaration, and I'm quoting, and this is on JA360, quote, this assumption would not hold true only if the internet-based secondary market for imported pipe fittings were radically different from the market for US-made pipe fittings. While possible, for example, that the eBay market is heavily favored towards US-made products, this seems difficult to imagine, especially since eBay sellers are not making any special effort to show US markings, close quote. So it wasn't just an assumption that he pulled out of thin air. He thought it was a reasonable assumption to make, in his opinion, as an expert statistician. And this is really the 12B6 problem, I think, here, which is that the district court substituted its view of statistics for the view of an actual expert in statistics. And at the 12B6 stage, where we weren't even required to submit expert testimony, where nobody's been cross-examined or anything, that was improper. What we're asking for at this stage is simply the right to ask Victaulic, are you marking your products that you make overseas? I'd like to ask them that question under oath. That's all we're asking for at this point. They know whether what we're saying is true. But for purposes of 12B6, the court is supposed to assume that what we're saying is true. And again, the eBay study, what it found was one out of 221 representative samples, one that had a proper fitting. And that was a very unusual, one proper marking that had a very unusual fitting. It is true that if you look at one photograph, and I will not deny this, all I do is look at one photograph. I cannot tell you whether it's marked properly or not. But if I look at hundreds and I'm not finding a single made-in-China mark, a single made-in-Poland mark, or a single made-in-Mexico mark, and we know because the district court agreed with this, that a substantial portion of their U.S. sales came from those countries, where are those marks? All right, Mr. Tico, we do have a few more, but thank you very much for your arguments. And Mr. Whitaker, thank you very much. We do have to recess. Oh, you saved Taffer Bow? You have to step up here. Yeah, sure, come on in. I just want to make one point, because I think it's an important point. Marking duties can be avoided in various ways, but that's true of all duties. All duties can be avoided, which occur at the time of importation, if the importer says, oh, the duties are too much, and subsequently re-exports them. So Mr. Hill's only reason he gave for why marking duties are contingent would exclude all duties from the False Claims Act. That cannot be right, and he agrees that duties are generally included. One very quick question. Why isn't there, or perhaps there is, you can point us to it, any place on a customs entry form that just asks for verification of this? Well, I'm glad you asked that, Your Honor. I mean, I think the focus on the customs form is a little bit of a sideshow. I mean, there are a variety of ways in which importers interact with CDP, and I'm not aware of any specific place, but certainly there are informal interactions, and we would expect importers, whether informally or formally, in some way, and perhaps even orally, because they deal with these officers, and we would expect them at some point, if they know, again, the allegation here is they know they're bringing in unmarked goods, we would expect them, at least orally, to bring that to our attention at some point in the process. But this is a far more roundabout way of trying to give rise to a False Claims Act than a statement on the form that says exported, you know, imported from abroad, check, marked or unmarked, checked. Well, we expect the goods to be marked. I mean, that's the way the scheme works, so it wouldn't make sense to have a place in the form that, you know, for estimated duties or something. But again, we do expect them to bring to our attention material omissions, and this would be an example of that. It is an important part of the process. So, and I mean, and again, if you say it's not an obligation, it wouldn't be an obligation even if, for example, they had misstated the country of origin. You know, if they had misstated the country of origin, that can affect the marking duties you owe as well. And under their rationale, if it's not an obligation, then there's no liability, even if there were a false statement. And that can't be right. Thank you, Mr. Whitaker.